STATE EX REL. WILLIAMS, Appellant, vs. SAMUELSON, Respondent.

*February 1—April 30, 1907.*

Quo warranto: *Action by whom brought: Taxpayers: Refusal of attorney general to act: Constitutional law: Who are "county officers:" County supervisor of assessment: Construction of statutes: Qualifications for office: Official bonds: Local self-government: Assessment for taxation.*

1. Under sec. 3466, Stats. (1898), providing that an action of *quo warranto* may be brought in the name of the state by a private person on his own complaint when the attorney general refuses

to act or when the office usurped pertains to a county, etc., the person bringing the action must have some interest in ending the claimed usurpation, but it is sufficient that he be a taxpayer of the district affected.

2. The office of county supervisor of assessment, created by ch. 445, Laws of 1901, is an office which "pertains to a county," within the meaning of said sec. 3466.

3. The fact that in an action brought in the name of the state by a private person under sec. 3466, Stats. (1898), the attorney general appears and continues as one of the attorneys for the defendant sufficiently shows that an application to him to commence the action would have been futile, and is equivalent to a refusal by him to act in the matter on behalf of the state.

4. The county supervisor of assessment whose election by the county board for a term of three years is provided for by ch. 445, Laws of 1901, is not a county officer within the meaning of sec. 4, art. VI, Const., providing that "sheriffs, coroners, . . . and all other county officers except judicial officers shall be chosen by the electors of the respective counties once in every two years."

5. The term "all other county officers," incorporated into sec. 4, art. VI, Const., by amendment in 1882, means the heads of the several major divisions of county government existing at that time, and the section as amended does not take away the legislative power mentioned in sec. 9, art. XIII, to create other county offices with other duties and to provide for the manner of filling such offices and the terms thereof.

6. Obscurities in constitutional provisions are discoverable by the same process as are uncertainties in legislative enactments, and are to be dealt with in substantially the same way in determining the real intent of the lawmakers.

7. Where language used in a constitution may reasonably have more than one meaning, long, constant, and uniform legislative adoption of one of such meanings, not in violation of any existing judicial construction, may be taken as controlling.

8. As to offices created by the legislature and having peculiar duties incident thereto, the legislature may prescribe qualifications if they are reasonable and not opposed to constitutional provisions or the spirit of the constitution.

9. A requirement that, in order to be eligible to the office of county supervisor of assessment, a person must have been an elector and householder of the county not less than four years, is not unreasonable.

10. The legislature may provide, in respect to an office created by it, that the official bond of the officer shall be by a surety company and at public expense.

11. Ch. 445, Laws of 1901, which gives to a county supervisor of assessment supervision and direction of the work of the assessors in his county, but does not take out of the hands of an assessor the duties of his office or take away his right to exercise his discretion in valuing property, does not violate the right of local self-government. The whole duty of the supervisor, under said act, has reference to assisting the assessors, testing their work, seeing that the law is not violated, and in case of violations applying the proper remedy.

[12. Whether ch. 259, Laws of 1905, imposing new duties on the supervisor of assessment, violates the right of local self-government, not decided.]

APPEAL from an order of the circuit court for Clark county: E. W. HELMS, Judge. *Affirmed.*

Action of *quo warranto* involving the right of the defendant to hold and perform the duties of the office of county supervisor of assessment for Clark county, Wisconsin, under ch. 445, Laws of 1901.

The complaint by appropriate allegations shows that the defendant was, in form, duly elected by the county board of Clark county to the office in question November 18, 1904, for the term of three years, commencing on the first Monday of January, 1905; that he duly qualified according to the requirements of said ch. 445, and has since that time performed the prescribed duties of such office, and further alleges that there is no such office in fact; that his pretense in the matter is a usurpation because of the law, so called, aforesaid being unconstitutional and void.

The defendant by his attorneys demurred to the complaint, *first,* for want of jurisdiction of the person of the defendant or the subject of the action; *second,* for want of legal capacity to sue; and *third,* for insufficiency of facts to constitute a cause of action. The demurrer was sustained and plaintiff appealed.

*George L. Jacques,* attorney, and *R. J. MacBride,* of counsel, for the appellant.

The cause was submitted for the respondent on the brief of *L. M. Sturdevant* and *F. M. Jackson.*

MARSHALL, J. The questions whether the relator had legal capacity to commence and maintain the action and whether the facts alleged are sufficient to constitute a cause of action seem to be the ones relied upon to sustain the order complained of, so this opinion will be restrained accordingly.

The first question is ruled in favor of appellant by the statute, sec. 3466, Stats. (1898). It is there provided that an action may be brought against the party offending in the name of the state by a private person on his own complaint when the attorney general refuses to act, or when the office usurped pertains to a county and any person shall usurp, intrude into, or unlawfully hold any public office. True, in order for a private person to be competent to commence such an action he must have some interest in ending the claimed usurpation, but that is satisfied by his being a taxpayer of the district affected. *State ex rel. Kelleher v. Fordyce,* 115 Wis. 608, 92 N. W. 430. As suggested by appellant's counsel, the point under discussion was directly passed upon in that case. It was again passed upon very decisively in *State ex rel. Weinsheim v. Leischer,* 117 Wis. 475, 94 N. W. 299, this language being used:

"True, such private person, when not suing on behalf of the public, must have some interest in the question, more than that which is common to all members of the community; but that interest certainly appears when it is shown that he is a property owner and taxpayer in the village, and hence is necessarily pecuniarily affected. . . . We can entertain no doubt but that the action is properly brought by the private relators named in the complaint, under the express terms of the statute. It is still an action by the state, but the state has, by statute, permitted it to be prosecuted by private parties."

Whether the office here alleged to be usurped is strictly a county office or not, it quite clearly pertains to a county, within the meaning of the law. The name of the office is "county supervisor of assessment," and the duties incident.

thereto are confined to and extend throughout the county. In the broad general sense of the term, the office is a county office.

Moreover, it appears that the attorney general was hostile to the maintenance of the action from the fact that he appeared therein as one of the attorneys for the respondent at the outset and continued as one of such attorneys down to the present time. That, as it has been held, shows that an application to him to commence the action would have been entirely futile, which is equivalent to a refusal to act in the matter on behalf of the state (*People ex rel. Ayres v. State Auditors,* 42 Mich. 422, 4 N. W. 274; *State ex rel. Lamb v. Cunningham,* 83 Wis. 90, 130, 53 N. W. 35), thus rendering operative that part of sec. 3466, Stats. (1898); aforesaid, making it competent for a private person to commence the action when the attorney general refuses to act. So there was legal capacity to commence and maintain the action both upon the ground of the attitude of the attorney general in the matter and the ground that the office pertained to a county.

The first question in order respecting whether the law is valid is, Does the feature which provides that the supervisor of assessment for each county shall be elected by its board of supervisors and for a term of three years, violate sec. 4, art. VI, of the constitution, providing that "sheriffs, coroners, registers of deeds, district attorneys, and all other county officers except judicial officers, shall be chosen by the electors of the respective counties once in every two years?" In short, is the so-called office of county supervisor of assessment a county office within the meaning of the language "all other county officers" as used in the quoted words? If so, manifestly, the legislature acted outside the scope of its authority in providing for filling the office otherwise than by an election by the people.

Conceding for the purposes of the discussion that in the broad, most comprehensive meaning of the term "county offi-

cers" a county supervisor of assessment would be included therein, the ultimate question is whether the language is to be taken in that sense or in a restricted sense excluding such officers.

While the language of a law, whether fundamental or a legislative creation, which is plain, looking at its literal sense, ordinarily, in such sense, is to be regarded as expressing the intent of the lawmakers, that sense may be viewed broadly or restrictively, or even violated, within the limits that the reasonable meaning of words cannot be departed from, in case of their being ambiguous and such departure being necessary in order to render efficient the purpose of the lawmakers. This subject has been many times discussed in our decisions. The law in respect to the matter was declared in *Rice v. Ashland Co.* 108 Wis. 189, 192, 84 N. W. 189, 190, thus:

"There must be some uncertainty of sense, else the natural and ordinary meaning of the words must prevail. When there is no such uncertainty, to resort to judicial construction to extend or restrict the meaning of words and give to a legislative enactment a character other than that which its language plainly indicates, it is said, 'would be extremely dangerous, for there would be no law, however definite and precise in its nature, which might not thereby be rendered useless.' . . . But courts are obliged in many cases to go further. . . . It is always presumed, in regard to a statute, that no absurd or unreasonable result was intended by the legislature. Hence if, viewing a statute from the standpoint of the literal sense of its language, it is unreasonable or absurd, an obscurity of meaning exists, calling for judicial construction. . . . While courts do not, and cannot properly, bend words out of their reasonable meaning to effect a legislative purpose, they do give to words a liberal or strict interpretation within the bounds of reason, sacrificing literal sense and rejecting every interpretation not in harmony with the evident intent of the lawmakers rather than that such intent shall fail."

So before attempting to read the provision of the constitution in question other than in the plain literal sense thereof,

we must reach the conclusion that ambiguity exists, when we view it according to established principles.

The language of a law is not necessarily free from ambiguity merely because looking thereto alone no uncertainty of meaning appears. Ambiguity, as has often been said, may as well spring from the effect that would result by applying a law in its literal sense, as from obscurity of expression in the words themselves. This subject was thus treated in *Rossmiller v. State,* 114 Wis. 169, 178, 89 N. W. 839, 841:

"It is fundamental that if, giving to the words of an act their literal or natural meaning, the conclusion reached would be unreasonable or absurd, some other meaning within the reasonable scope of the words may be adopted to avoid that result, if it appears that such meaning may probably have been the one intended."

One of the familiar principles to be applied in determining whether words of a law which are plain on their face are ambiguous nevertheless, is that it must always be presumed that the lawmakers did not intend anything clearly unreasonable or absurd. Another familiar principle is that implied repeals are not favored. Therefore, where a later enactment in its ordinary sense nullifies an earlier one to which, however, it makes no reference, ambiguity exists calling for judicial construction to the end that a meaning may be attributed to the later law, if the lawmakers so intended, which will give effect thereto without disturbing the earlier enactment. The rule on that subject has often been declared here. It was stated in *Mason v. Ashland,* 98 Wis. 540, 545, 74 N. W. 357, 359, thus:

"In judicial construction, one of the most familiar rules is that conflicts by implication or otherwise, between different provisions of a statute, or between two statutes, are not favored and will not be held to exist if they may be otherwise reasonably construed. . . . When two acts or provisions are susceptible of a construction which will give operation to both and all of the words in each, without doing violence to either,

it is incumbent on the court to search for some reasonable ground for such construction and not reach the conclusion that a fatal conflict exists, unless the meaning of the words and the manner of their use be such as to render it impossible to reconcile them on any reasonable theory, whereby all may be given force and effect."

Applying the foregoing to the situation in hand it seems that we must go further, before condemning the law in question as invalid, than merely to determine that looking at the literal sense of sec. 4, art. VI, of the constitution it includes all officers who are in any sense "county officers." It would be an extraordinary restriction upon legislative power to so tie its hands as to disable it from creating any sort of an office, however insignificant, pertaining to a county to be filled otherwise than by an election by the people. Practical construction by the uniform course of legislation since the constitution was amended into its present form condemns the idea that so drastic a restriction was intended. There is the law providing for county commissioners of equalization, sec. 1077a, Stats. (1898). Such officers have been held not to be county officers in a constitutional sense. *State ex rel. Brown Co. v. Myers,* 52 Wis. 628, 632, 9 N. W. 777, 778. The court there did not regard the term "county officers" as used in the constitution to necessarily include every officer whose duty pertains to a county. This language was used:

"It is, doubtless, the meaning and intent of the constitution, that certain officers shall be elected or appointed by the people of the district to which their offices appertain. But we do not think the commissioners appointed under this act are 'officers' within the meaning of the constitution. They are merely appointed to do a specific act, and when that act is performed their power ceases."

Then there is the law providing for county game wardens (sec. 2, ch. 312, Laws of 1899). They are required to be authorized by the county board and to be appointed in a particular manner, their compensation to be fixed by the county

board and paid out of the county treasury as other county officers are paid. Such officials have been held elsewhere to be county officers within the broad meaning of the term. *State ex rel. Armstrong v. Halliday,* 61 Ohio St. 171, 55 N. E. 175. Again we have superintendents of the poor, who are required to give bonds like other county officers, sec. 1520, Stats. (1898), and the law providing for trustees to manage the charitable county institutions in the county of Milwaukee (ch. 94, Laws of 1905). There are others, but enough have been referred to for the purposes of the discussion. All mentioned are as distinctively, it would seem, county officers as are county supervisors of assessment. So if the language of the constitution in question is so restrictive on legislative power as to include all county officers falling within the full scope of the term in question, the whole course of legislation for a quarter of a century has been wrong and we have many county officers, so called, who have no legitimate basis for the authority they assume to exercise.

Again if sec. 4, art. VI, includes every officer who may in any sense be regarded as a county officer, it is plainly repugnant to the spirit, and in our judgment to the letter, of sec. 9, art. XIII, of the constitution, which provides that "all county officers whose election or appointment is not provided for by this constitution shall be elected by the electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct." That contemplates the existence of county officers whose election is provided for by the fundamental law and others to be elected or appointed as the legislature shall provide.

It is an inefficient answer to the foregoing indications of ambiguity to say that the term "all other county officers" does not admit of any other reasonable construction than the one including all officers however insignificant whose duties appertain to a county at large. The term obviously has a broad general and a narrow or particular meaning, and the sense in-

State ex rel. Williams v. Samuelson, 131 Wis. 499.

tended must be determined with reference to the particular case. There are heads of major divisions of state and county government which are commonly known as state and county officers, and, generally speaking, when those terms are used one associates the same with some such head.

In *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 506, a similar question was involved. Ch. 366, Laws of 1905, provides that the place of trial of all actions authorized to be brought against any of the state officers in their official capacities shall be in Dane county. The court upon due consideration held that the term "state officers" may be construed as meaning only heads of the executive departments of the state elected by the people at large, such as governor, lieutenant-governor, state treasurer, secretary of state, attorney general, and the like, that being its particular meaning, or given its more comprehensive sense including every person whose duties appertain to the state at large, according to the legislative intention; that the exact sense in which the term is used in any particular law must often be determined by ordinary rules for judicial construction. Applying the rule that effects and consequences are to be regarded in construing a law where the words thereof will admit of either of two reasonable meanings, the court held that in the law in question the words "any of the state officers" should be restrained to heads of departments having their official residence at the state capitol, and expected to keep open office there during business hours and, generally speaking, to be there themselves; that is, that the term was used by the lawmakers in its narrow and particular instead of its broad and general sense.

In harmony with the foregoing we find it to have been held by the supreme court of the United States that the term "county officer," strictly speaking, "is one by whom the county performs its usual political functions; its functions of government." One who "exercises continuously, and as a

part of the regular and permanent administration of government, its public powers, trusts, or duties." *Sheboygan Co. v. Parker,* 3 Wall. 93. In this connection several cases in the books where the term "county officers" has been construed might be discussed, but to do so would throw no satisfactory light on the question we have to decide, since the conditions here are different from those referred to in such cases. The following are a few of them: *Foushee v. Christian,* 119 N. C. 159, 25 S. E. 793; *Laird v. Leap,* 42 Neb. 834, 60 N. W. 1043; *State ex rel. v. Brennan,* 49 Ohio St. 33, 29 N. E. 593; *State ex rel. Armstrong v. Halliday,* 61 Ohio St. 171, 55 N. E. 175; *State v. Tilford,* 1 Nev. 240; *Hutchinson v. Ashburn,* 5 Neb. 402; *State ex rel. Holmes v. Dillon,* 90 Mo. 229, 2 S. W. 417.

In determining whether the words "all other county officers" were used in the constitution in their particular sense, the affirmative is suggested at once by the rule of *noscitur a sociis.* Several but not all of the principal heads of county government required to have their offices at the county seats and ordinarily in the building provided for that purpose are mentioned, followed by the term "all other county officers except judicial officers." In that we have a very strong indication that minor officials not usually thought of when the term "county officers" is used were not intended to be included, but only sheriffs, coroners, registers of deeds, and the like. Such indication is emphasized, as we shall see, with striking significance by the conditions existing at the time of the formation of the constitution and at the time sec. 4, art. VI, was amended into its present form, and the way the subject has always been treated by the legislature as we have heretofore seen.

It may be thought that the rules for the construction of legislative enactments do not apply to the construction of the fundamental law, and that the argument thus far on that account is somewhat beside the case. The authorities, however,

are otherwise, being to the effect that obscurities in constitutional provisions are discoverable by the same process as are uncertainties in legislative enactments, and are to be dealt with in substantially the same way in determining the real intent of the lawmakers. Potter's Dwarris, Stat. & Const. 654, 655; Story, Const. (5th ed.) §§ 397–404.

At the time of the adoption of the constitution there was a county system of government with the ordinary principal heads, such as sheriffs, coroners, district attorneys, county treasurers, county surveyors, registers of deeds, county commissioners, and clerks of such commissioners, who performed substantially the duties now performed by county clerks. The constitution was adopted largely with reference to that situation. In discussing a somewhat similar situation in New York, it was said that the constitution should be deemed to have been prepared and adopted in reference to existing laws upon the provisions of which in detail it depended to be set in operation. *Rathbone v. Wirth,* 150 N. Y. 459, 473, 45 N. E. 15; *People v. Raymond,* 37 N. Y. 428.

Now we find that the framers of the constitution, dealing with the existing conditions and contemplating the continuation of its general features, provided that certain of the existing heads of county governments should be elected by the people, viz., sheriffs, coroners, registers of deeds, and district attorneys, leaving the other heads to be provided for, as well as minor 'county officers, in such way as the legislature might provide, and in respect thereto sec. 9, art. XIII, which has never been changed, was adopted to cover the subject in the words heretofore quoted, viz.:

"All county officers whose election or appointment is not provided for by this constitution shall be elected by the electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct."

And contemplating that the legislature might from time to time create new county officers with duties different from

those theretofore performed by such officers, it was provided in said sec. 9 that:

"All officers whose offices may hereafter be created by law, shall be elected by the people or appointed, as the legislature may direct."

Following the constitutional plan in the first revision of the statutes a chapter was devoted to the subject of counties and county officers. That included members of the county board of supervisors, taking the place of the old commissioner system, and made up of the chairmen of the boards of supervisors of the several towns and the supervisors in cities as county officers; also the clerk of the board of supervisors, the clerk of the circuit court, district attorney, judges of probate, court commissioners, sheriffs, coroners, county treasurers, registers of deeds, and county surveyors. Ch. 10, R. S. 1849. That system was continued in the revision of 1858, ch. 13, and again continued in the revision of 1878, the subject of county officers being treated under ch. 37, the same being extended to include superintendent of schools, and all being made elective by the people. Later, in 1882, sec. 4, art. VI, of the constitution was amended so as to conform thereto by adding after the words "district attorneys" the words "and all other county officers except judicial officers," thus including county clerks and superintendents of schools, leaving sec. 9, art. XIII, as before, referring to certain county officers whose election was provided for in the constitution, pointing quite plainly to sec. 4, art. VI, and other county officers whose election was not provided for, they to be elected by the electors of the respective counties or appointed by the boards of supervisors, or other county authorities, as the legislature shall direct, and leaving the legislature free to create other officers to be "elected by the people or appointed, as the legislature may direct." It seems quite plain that sec. 4, art. VI, from the beginning dealt with county officers in the restrictive sense,—the recognized heads of the several divisions of county government as treated in the

statutes from the beginning under the head of county of-
ficers, and that sec. 9 in the opening lines refers to such
county officers and in the closing lines to such other county
officers as the legislature might from time to time create, re-
serving to it authority to provide for filling the offices either
dy election or appointment.

As argued by respondent's attorneys, the constitutional pro-
vision in New York identical with our sec. 9, art. XIII, was
early held to use the term "county officers" with reference
to officers thus known at the time of the adoption of the con-
stitution, and that the right was reserved to create additional
county offices with duties different from those of the officers
specially mentioned, and to provide for filling them. *People
ex rel. Wood v. Draper,* 15 N. Y. 532, 538; *People ex rel.
Loew v. Batchelor,* 22 N. Y. 128, 140; *People ex rel. Brown
v. Woodruff,* 32 N. Y. 355, 364; *People v. Raymond,* 37 N. Y.
428; *Matter of Brenner,* 170 N. Y. 185, 190, 63 N. E. 133;
*Allison v. Welde,* 172 N. Y. 421, 65 N. E. 263. Those cases
and others that might be referred to are to the effect that the
legislature under such a constitutional system as ours, so far
as indicated by sec. 9, art. XIII, aforesaid, is free to create a
new county office and provide for filling it by some authority
other than direct action by the electors, so long as the duties
of the office are not such as were incident to some county of-
fice at the time of the formation of the constitution.

Without further discussion we are constrained to hold that
the term "all other county officers" was used in the instance
in question in harmony with the statutory division of officers
into state, county, and town officers existing at the time of
its incorporation into the fundamental law. In other words,
in its particular sense—that of heads of the several major
divisions of county government as then understood,—and
without any thought of surrendering the legislative power
mentioned in sec. 9, art. XIII, to create other county offices
with duties other than those incident to those offices grouped

under the special statutory treatment of the subject, and to
provide for the manner of filling such offices, not of course
invading the constitutional system of local self-government.
That, as we have seen, is supported by the fact that such in-
terpretation of the words is within their reasonable scope,
and is necessary to avoid implied repeal of a most impor-
tant provision of the constitution. It is supported by the
rule that surrender by the people of a commonly exercised
legislative power to create new offices and provide for filling
the same should not rest on any less certain basis than plain
unmistakable language. It is supported by the rule of *nos-
citur a sociis*. It is supported by the doctrine that the term
"county officer" as used in the constitution refers only to such
county officers, or the duties incident thereto, as existed at
the time of the adoption of the constitution. It is further
supported by practical construction, as indicated by numer-
ous legislative enactments creating new county offices, in the
broad sense of the term, and providing for filling the same
otherwise than by the electors of the counties; the history in
that regard extending over a period of more than a quarter of
a century.

The last phase of the case mentioned we deem of special
importance, since there are many important laws which
might otherwise be fatally affected. True, practical con-
struction is of no consequence where the language of the law
will reasonably permit of but one meaning, but where it is
otherwise, as we find to be the case here, and the legislature
has consistently, and not in violation of any existing judicial
construction, adopted a particular meaning reasonably at-
tributable to the law, as shown by the general course of legis-
lation covering a long period of time, such circumstance may
well be taken as controlling. *Mayor v. State ex rel. Board of
Police,* 15 Md. 376. In that case it was held that a pro-
vision of a constitution may receive interpretation from long,

constant, and uniform legislative practice. The opinion is thus epitomized in the syllabus:

"Such legislation is evidence of contemporaneous acquiescence of the people, and the various departments, in this practical interpretation, and the constitution may receive an interpretation from a long, constant, and uniform legislative practice."

To that effect are *McCulloch v. Maryland,* 4 Wheat. 316, and numerous cases cited in the note to § 476, 2 Lewis's Sutherland, Stat. Constr. (2d ed.), where the same is stated as established doctrine.

It is next argued that ch. 445, Laws of 1901, is void as arbitrary class legislation, in that it violates the letter and spirit of the constitution in providing that the term of the office created shall be three years, whereas the term for county officers generally is two years, and it provides special and unreasonable qualifications, in that a person to be eligible to the office is required to be an elector and householder of the county not less than four years before the date of his election, and is required to furnish a bond to the state of Wisconsin signed by an authorized surety company conditioned for the faithful and impartial discharge of his duties.

The suggestion that the three-year term of office contravenes the constitution as to the term of office of county officers is answered by what has been said, in that supervisors of assessment are not constitutional officers in the sense that they are specially mentioned with a special restriction as to their election and term of office.

There is not in our constitution any general provision respecting eligibility to public office. We do not find any authority, in the numerous cases cited, to the effect that there is any implied limitation upon the right of the legislature to prescribe reasonable qualifications for public offices, not contravening any constitutional provision on the subject. Especially is that true where the office itself was not in existence

at the time of the adoption of the constitution, but is a mere legislative creation under the reservation of authority in that regard. It is useless to examine the numerous cases cited to our attention. Many of them have reference to provisions not found in our constitution. A good illustration is *State ex rel. Holt v. Denny,* 118 Ind. 449, 21 N. E. 274, where a requirement of five years' residence for eligibility to public office was condemned because of a special provision which we do not have. In Throop, Public Officers, at § 73, it is stated as a general rule that the legislature has full power to prescribe qualifications for public office in addition to those prescribed by the constitution, if any, provided that they are reasonable and not opposed to the constitutional provisions or to the spirit of the constitution. That certainly must be true as to offices created by the legislature having incident thereto peculiar duties.

The requirement in the law in question that a candidate to be eligible shall be an elector and householder of the county for not less than four years seems reasonable and very moderate. A supervisor of assessment in order to be fairly equipped for his duties must needs have some familiarity with the county in which his duties are to be performed. The requirements prescribed by the law seem to be about as moderate a guaranty that he shall have such familiarity as legislative wisdom could well have devised. The substantial part of such requirements seems to be actual identification of the candidate with the people and interests of the county for a period of four years, at least, by his having been an elector and householder therein during that period.

Our attention is called to *State ex rel. v. Robbins,* 71 Ohio St. 273, 73 N. E. 470, holding that a law requiring official bonds to be obtained of surety companies is unconstitutional as a restriction upon the liberty to contract. The case is quite novel and seems to stand alone, and to rest upon reasoning which we are not willing to follow. It is not suggested that

such a law violates any express provision of the constitution, but rather that it violates the spirit thereof as contained in some general declarations referred to. It is not perceived why it is not within the scope of legislative authority, especially in regard to an office created by the legislature, to provide that the official bond of the officer elected or appointed to fill the office shall be by a surety company and at public expense.

Is ch. 445 a usurpation, in that it violates the right of local self-government, taking from the various primary taxing districts of the county the right to have the subjects of direct taxation assessed therefor by officers of their own choosing? That is the next question to be solved. Counsel for appellant maintain the affirmative, because sec. 4 provides that the county supervisor of assessment shall have full and complete supervision and direction of the work of the assessors in his county. However, when we come to examine the precise nature of the supervision referred to we find that it does not take from the local assessors to any extent their discretion in respect to valuing property for taxation. The supervisor is required, as it seems, to assist and advise the local assessors and see that they obey the law. After the supervisor has exhausted his authority it is for the local assessor in every case, or the board of review, to exercise discretion as to valuing the property. The supervisor's work consists wholly, as it seems, in seeing that the assessor performs his duty, not in performing the assessor's duty for him. Sec. 4 provides that the supervisor shall annually call the assessors together for conference and instruction relative to their duties. Sec. 5 requires him to examine public books, records, and papers in his county for the purpose of obtaining knowledge respecting property assessable in the assessment districts of his county. Sec. 6 requires him to test the work of assessors during the progress of their work, and provides that if he shall ascertain that any property has been omitted or not assessed ac-

cording to law he shall bring the same to the attention of the assessor of the proper district, and if he then neglects or refuses to correct the assessment that the supervisor shall report the same in a prescribed manner to the board of review for its action.   Sec. 7 provides for the supervisor making complaint to the presiding judge for the removal of an assessor whom he believes to be guilty of a violation of law. Sec. 8 requires the supervisor to make a report in detail of his work to the county board.   Sec. 9 provides that, for the purpose of testing the accuracy of the assessment made in any district for any year and to secure information for use in equalizing values between taxing districts, an assessment may be made in such assessment district for the same year by the supervisor of assessment and reported to the county board.   Sec. 10 provides that the supervisors of assessment shall be under the supervision and direction of the state tax commission.   Thus it will be seen that the supervision of the local assessors contemplated by the act does not extend in any respect to taking out of the hands of an assessor the duties of his office as they have always existed, to assess all the property in his district subject to taxation according to his judgment and in accordance with the directions contained in the statutes.   The whole duty of the supervisor has reference to lending him assistance, to testing his work, to seeing that the law is not being violated, and in case of violations to applying the proper remedy.

Ch. 259, Laws of 1905, was referred to on the argument as having some bearing on the question here involved, but it is considered that it does not.   This action challenges the existence of the office of supervisor of assessment under the act of 1901, purporting to create it, and challenges the right of the respondent to hold and perform the functions of such an office.   The act of 1905 is an independent provision imposing new duties on the supervisor of assessment.   Whether the performance of such duties would violate the right of local

self-government is not involved in the questions raised as to the validity of the act of 1901. The general result of the foregoing is that the order appealed from is right and must be affirmed.

*By the Court.*—So ordered.

DODGE, J., dissents.